# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

JASON DECKARD,

        Plaintiff,

   v.

ANDREW M. SAUL, Commissioner of Social Security,[1]

        Defendant.

Case No. 18-cv-04301-BLF

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT; REVERSING THE DENIAL OF BENEFITS; AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS**

[Re: ECF 19, 20]

Plaintiff Jason Deckard ("Deckard") appeals a final decision of the Commissioner of Social Security denying his application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, and his application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. Deckard asks the Court to reverse the Commissioner's decision and remand for payment of benefits or further administrative proceedings. The parties' cross-motions for summary judgment have been fully briefed, and the matter has been submitted without oral argument pursuant to Civil Local Rule 16-5.

For the reasons discussed below, the Court GRANTS IN PART AND DENIES IN PART Plaintiff's motion, DENIES Defendant's motion, REVERSES the denial of benefits, and REMANDS for further administrative proceedings.

---

[1] Andrew M. Saul became Commissioner of Social Security on June 17, 2019 and therefore is substituted for Nancy A. Berryhill as Defendant. *See* 42 U.S.C. § 405(g); Fed. Civ. P. 25(d).

## I.    BACKGROUND

Deckard was born on September 18, 1983.  Administrative Record ("AR") 29.  He was placed in special education classes throughout his schooling and he repeated the third grade.  AR 47.  He has a high school education, he is able to communicate in English, and he has past relevant work as a package handler for a shipping company and as a loader for a wholesale goods store.  AR 29.  Deckard claims disability with an onset date of August 15, 2010 due to several impairments, including back pain, affective disorders, anxiety disorder, intellectual disability, and avoidant personality disorder.  AR 19, 23.  He was 26 years old on the date of alleged onset and 34 on the date of the ALJ's decision, and therefore he is considered a younger individual (age 18-49).  AR 29.  For purposes of his Title II claim, Deckard's date last insured was March 31, 2016.  AR 22.

After his application for benefits was denied initially and upon reconsideration, Deckard requested a hearing before an administrative law judge ("ALJ").  AR 19.  ALJ David R. Mazzi conducted a hearing on April 27, 2016, at which both Deckard and a vocational expert ("VE") testified.  *Id.*  Deckard requested a supplemental hearing, which ALJ Mazzi conducted on February 22, 2017.  *Id.*  Deckard and a VE testified at the supplemental hearing.  *Id.*  The ALJ issued a written decision on September 27, 2017, finding that Deckard was not disabled at any time from the alleged onset date of August 15, 2010 through the date of the ALJ's decision issued September 27, 2017.  AR 30.  Consequently, the ALJ found that Deckard is not entitled to benefits.  *Id.*  The Appeals Council affirmed the ALJ's decision, making it the final decision of the Commissioner.  AR 1-5.

## II.    LEGAL STANDARD

### A.    Standard of Review

Pursuant to sentence four of 42 U.S.C. § 405(g), district courts "have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 USC § 405(g).  However, "a federal court's review of Social Security determinations is quite limited."  *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015).

Federal courts leave it to the Administrative Law Judge ("ALJ") "to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.'" *Id.* (quoting *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014)).

A court "will disturb the Commissioner's decision to deny benefits only if it is not supported by substantial evidence or is based on legal error." *Brown-Hunter*, 806 F.3d at 492 (internal quotation marks and citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and must be more than a mere scintilla, but may be less than a preponderance." *Rounds v. Comm'r of Soc. Sec. Admin.*, 807 F.3d 996, 1002 (9th Cir. 2015) (internal quotation marks and citations omitted). A court "must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.* (internal quotation marks and citation omitted). If the evidence is susceptible to more than one rational interpretation, the ALJ's findings must be upheld if supported by reasonable inferences drawn from the record. *Id.*

Finally, even when the ALJ commits legal error, the ALJ's decision will be upheld so long as the error is harmless. *See Brown-Hunter*, 806 F.3d at 492. However, "[a] reviewing court may not make independent findings based on the evidence before the ALJ to conclude that the ALJ's error was harmless." *Id.* The court is "constrained to review the reasons the ALJ asserts." *Id.*

## B. Standard for Determining Disability

A claimant seeking DIB under Title II must establish disability on or prior to the date last insured. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1460 (9th Cir. 1995). Determination of the date last insured involves a calculation of the number of quarters the claimant was employed within a certain time frame. *See* 42 U.S.C. § 423. A claimant seeking SSI under Title XVI must establish disability between the date of the application for benefits and the date of the ALJ's decision. *See Sophie Jean P. v. Comm'r of Soc. Sec.*, No. 6:18-CV-02237-JR, 2019 WL 6749415, at *2 (D. Or. Dec. 11, 2019).

"To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, determining: (1) whether the claimant is doing substantial gainful activity;

(2) whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments that has lasted for more than 12 months; (3) whether the impairment meets or equals one of the listings in the regulations; (4) whether, given the claimant's residual functional capacity, the claimant can still do his or her past relevant work; and (5) whether the claimant can make an adjustment to other work." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (internal quotation marks and citations omitted). The residual functional capacity ("RFC") referenced at step four is what a claimant can still do despite his or her limitations. *Id.* at 1160 n.5. "The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

## III. DISCUSSION

Below, the Court summarizes the ALJ's determinations at each step of the sequential analysis. The Court then identifies and discusses Deckard's challenges to the ALJ's determinations.

### A. ALJ's Determinations

At step one, the ALJ determined that Deckard has not engaged in substantial gainful activity from his alleged onset date, August 15, 2010, through the date of the ALJ's decision, September 27, 2017. AR 22.

At step two, the ALJ found that Deckard has the following severe impairments: "back impairment; status-post right lower extremity injury; affective disorders; anxiety disorder." AR 23. The ALJ found that Deckard has additional non-severe mental impairments, specifically "an intellectual disability and avoidant personality disorder." *Id.* The ALJ determined that Deckard had used medical marijuana and was diagnosed with cannabis abuse, but the ALJ found that the cannabis abuse is not a severe impairment and that "[a] substance use disorder is not a factor material to a determination of disability in this case." *Id.*

At step 3, the ALJ concluded that Deckard's impairments do not meet or medically equal the severity of one of the listed impairments in the regulations. AR 24.

Prior to making a step four determination, the ALJ found that Deckard has the RFC to

perform a reduced range of light work.  AR 26.  Light work is defined in the regulations as follows:

> Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).  The ALJ found that Deckard "has the residual functional capacity to perform light work . . . and that he is able to perform simple routine tasks equating to unskilled work with the following limitations:  occasional stooping; is limited to performing simple and routine tasks equating to unskilled work with occasional contact with coworkers or the public."  AR 26.

Based on the above RFC and the testimony of a VE, the ALJ found at step four that Deckard is unable to perform any past relevant work.  AR 29.  Specifically, the ALJ found that all of Deckard's past relevant work is classified as medium or heavy work, and Deckard is limited to light work.  *Id.*

At step 5, the ALJ considered Deckard's RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines ("Guidelines" or "Grids").  AR 30.  "The Medical-Vocational Guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy."  *Ford v. Saul*, No. 18-35794, --- F.3d ----, 2020 WL 829864, at *3 n.4 (9th Cir. Feb. 20, 2020) (internal quotation marks and citation omitted).  "The Guidelines consist of a matrix of the four factors identified by Congress – physical ability, age, education, and work experience – and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy."  *Id.* (internal quotation marks and citation omitted).  The ALJ found that Deckard's limitations "have little or no effect on the occupational base of unskilled light work," and that "even a limitation to occasional interaction with the public or coworkers does not erode the base of unskilled light and sedentary jobs to less than significant

numbers in the economy." AR 30. Accordingly, the ALJ found that Deckard is not disabled. *Id.*

## B. Deckard's Challenges to the ALJ's Determinations

Deckard claims that the ALJ erred in six ways. First, Deckard asserts that the ALJ erred at step two in finding that Deckard's intellectual disability is non-severe. Second, Deckard contends that the ALJ erred in rejecting the opinions of certain providers without articulating specific and legitimate reasons for doing so.[2] Third, Deckard argues that the ALJ erred at step 3 in finding that Deckard's impairments do not meet SSA Adult Listing 12.05. Fourth, Deckard contends that the ALJ erred in rejecting Deckard's testimony without articulating specific, clear, and convincing reasons for doing so. Fifth, Deckard argues that the ALJ's RFC determination is not supported by substantial evidence. And sixth, Deckard asserts that the ALJ erred at step five in relying on the Grids, which apply only when they completely and accurately describe the claimant's abilities and limitations. *See Moore v. Apfel*, 216 F.3d 864, 869 (9th Cir. 2000). Deckard contends that the Grids are inapplicable in the present case, because they do not reflect intellectual disability.

The Commissioner asserts that the ALJ properly evaluated the record evidence and that substantial evidence supports the ALJ's determinations at each step of the sequential analysis.

The Court addresses the parties' arguments on these points in turn, as follows.

### 1. Step Two Determination

Deckard argues that the ALJ erred at step two when he found that Deckard's only severe impairments are a back impairment, lower extremity injury, affective disorders, and anxiety disorder. Deckard asserts that the ALJ also should have found his intellectual disability to be a severe impairment. As noted above, the ALJ found that Deckard's diagnosed intellectual disability is non-severe.

The Commissioner cites *Buck v. Berryhill*, 869 F.3d 1040 (9th Cir. 2017), for the proposition that step two is merely a screening device to eliminate claims by individuals with no impairments, and that Deckard suffered no prejudice from the ALJ's step two determination

---

[2] Deckard asserts that the ALJ erred in rejecting certain physicians' opinions without providing specific and legitimate reasons *or* clear and convincing reasons. As discussed below, the proper standard is specific and legitimate reasons, because the physicians' opinions at issue are controverted by the opinions of other physicians. *See Ford*, 2020 WL 829864, at *8.

United States District Court
Northern District of California

because the ALJ went on to steps three through five of the sequential analysis. The Commissioner's position is well-taken. "Step two is merely a threshold determination meant to screen out weak claims." *Buck*, 869 F.3d at 1048. Because step two was decided in Deckard's favor, and the ALJ went on to consider steps three through five, Deckard could not have been prejudiced by any error in the ALJ's determination as to which of Deckard's impairments are severe. *See id.* at 1049 (where step two was decided in the claimant's favor, "[h]e could not possibly have been prejudiced" and "[a]ny alleged error [was] therefore harmless").

The real thrust of Deckard's argument is that the ALJ failed to give adequate weight to Deckard's intellectual disability when deciding at step three that Deckard's impairments do not meet or medically equal the severity of a listed impairment, and when deciding Deckard's RFC. The step two determination is "not meant to identify the impairments that should be taken into account when determining the RFC." *Buck*, 869 F.3d at 1048-49. When determining a claimant's RFC, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Id.* at 1049 (internal quotation marks and citation omitted). "The RFC therefore *should* be exactly the same regardless of whether certain impairments are considered 'severe' or not." *Id.*

In light of the above, a challenge to the ALJ's step two determination does not appear to be an appropriate vehicle for seeking relief from the ALJ's characterization of Deckard's intellectual disability as non-severe. Deckard's assertion that he suffers from a severe intellectual disability more properly may be considered in the context of Deckard's challenges to the ALJ's step three determination, RFC determination, and step five determination. Because review of those determinations turns in large part on what evidence the ALJ credited and did not credit, the Court next will address the ALJ's asserted errors in weighing the medical evidence and assessing Deckard's credibility. The Court then will consider whether substantial evidence supports the ALJ's step three determination, RFC determination, and step five determination.

### 2. Medical Evidence

The ALJ considered medical opinion evidence from several examining and nonexamining physicians. AR 28-29. With respect to Deckard's physical impairments, the ALJ gave significant

weight to the opinions of the agency's nonexamining medical consultants, B. Williams, M.D., and L. Pancho, M.D., who found that Deckard can perform a range of light work. AR 28. The ALJ also credited the opinion of an examining orthopedist, Calvin Pon, M.D., who found that Deckard has the physical capacity for light work. *Id*. There does not appear to be any dispute on this record that Deckard retains the physical capacity to perform a range of light work.

With respect to Deckard's mental impairments, the ALJ gave significant weight to the agency's nonexamining psychological consultant, M. Morando, M.D. AR 28. Dr. Morando found that Deckard is capable of simple, routine tasks with limited public contact. *Id*. The ALJ gave some weight to examining psychologist Aparna Dixit, Psy.D., who found that Deckard has only mild mental functioning limitations. *Id*. The ALJ also gave some weight to the opinion of examining psychiatrist Michael Auza, M.D., who found that Deckard can understand, remember, and complete simple instructions without significant impairment and that he has moderate social limitations. The ALJ gave little weight to the opinions of examining psychologists Laura Catlin, Psy.D., and Ede Thomsen, Ph.D., both of whom found marked to extreme impairments in most areas of mental functioning, including a severe impairment in maintaining adequate pace and persistence to perform even simple tasks. *Id*. Finally, the ALJ assigned little weight to the opinion of social worker Katrina Steer, who stated that Deckard has marked limitations in sustained concentration and persistence and social interaction. AR 29.

Deckard contends that "the ALJ erred by improperly rejecting, in whole or part, the opinion of (1) examining provider, Laura Catlin, PsyD, (2) examining provider Ede Thomsen, PhD, (3) examining provider Michael Auza, MD, (4) nonexamining medical consultant, M. Morando, MD, and (5) examining provider, Katrina Steer, LCSW." Pl.'s MSJ at 11-12, ECF 19. The Commissioner argues that the ALJ properly weighed the medical evidence. The Court summarizes the applicable legal standard and then it addresses the errors asserted by Deckard.

### a. Legal Standard for Evaluating Medical Evidence

"Generally . . . the opinion of an examining physician must be afforded more weight than the opinion of a reviewing physician." *Ghanim*, 763 F.3d at 1160. "If the opinion of an examining doctor is contradicted by another doctor, it can only be rejected for specific and

legitimate reasons that are supported by substantial evidence in the record." *Ford*, 2020 WL 829864, at *8 (internal quotation marks and citation omitted). "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of an examining physician." *Buck*, 869 F.3d at 1050. "However, the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray*, 554 F.3d at 1228 (internal quotation marks, citation and alteration omitted).

"Only physicians and certain other qualified specialists are considered acceptable medical sources." *Ghanim*, 763 F.3d at 1161 (internal quotation marks, citation, and alteration omitted). Social workers are treated as "other sources" whose testimony may be disregarded "if the ALJ gives reasons germane to each witness for doing so." *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010).

### b. Drs. Catlin and Thomsen

Drs. Catlin and Thomsen, examining psychologists, found that Deckard suffers from severe mental impairments. AR 519-28, 550-61. Dr. Catlin diagnosed Deckard with Depressive Disorder, severe; Intellectual Disability, mild; and Avoidant Personality Disorder. AR 525. Dr. Catlin determined that Deckard has a Full Scale IQ score of 65, placing him within the borderline to extremely low range of intellectual functioning. AR 523. Dr. Catlin assessed Deckard's restriction of activities of daily living to be in the marked to extreme range, found that he has extreme difficulties in maintaining social functioning, found that he has extreme deficiencies of concentration, persistence, or pace, and concluded that his impairments would cause him to be absent from work more than four days a month. AR 527. Dr. Thomsen diagnosed Plaintiff with Social Anxiety Disorder; Major Depressive Disorder, Recurrent, Mild; Specific Learning Disorder, with Impairment in Reading; and Cannabis Use Disorder, Mild. AR 558. Consistent with Dr. Catlin, Dr. Thomsen found a Full Scale IQ score of 65, placing Deckard in the extremely low range, and that he has a severe deficit in attention/concentration/pace/persistence. AR 554. Dr. Thomsen opined that Deckard would be "unable to deal with typical work stress effectively." AR 557.

As discussed below, the opinions of Drs. Catlin and Thomsen regarding the severity of Deckard's mental impairments are controverted by the opinions of other mental health physicians, including examining psychologist Aparna Dixit, Psy.D., examining psychiatrist Michael Auza, M.D., and nonexamining psychological consultant, M. Morando, M.D. AR 28. Consequently, in order to reject the opinions of Drs. Catlin and Thomson, the ALJ must articulate "specific and legitimate reasons that are supported by substantial evidence in the record." *Ford*, 2020 WL 829864, at *8. The ALJ gave two reasons for rejecting the opinions of Drs. Catlin and Thomsen. AR 28. First, the ALJ found that Drs. Catlin and Thomsen relied in large part on Deckard's subjective allegations, which the ALJ found not credible. *Id.* Second, the ALJ found that the assessments of Drs. Catlin and Thomsen were contradicted by "the weight of the evidence, as discussed above, including the claimant's work history and activities." *Id.* The evidence "discussed above" includes other medical opinions as well as evidence regarding Deckard's work history and activities. *Id.*

### i.    Doctors' Reliance on Deckard's Subjective Reporting

Deckard asserts that the ALJ's statement that Drs. Catlin and Thomsen relied on Deckard's subjective reporting is not supported by the record and is a legally impermissible reason to reject their opinions. The Court agrees. While the reports do recount Deckard's subjective reporting, both doctors conducted clinical interviews and mental status evaluations. AR 519-28, 550-61. Dr. Catlin's report lists the following under Procedures and Tests Administered: Clinical Interview, WASI (Wechsler Abbreviated Scale of Intelligence), RBANs (Repeatable Battery for the Assessment of Neuropsychological Status), BDI Beck Depression Inventory, BSI (Brief Symptom Inventory), and Review of Records. AR 519. Dr. Thomsen's report lists the following under Procedures Administered: Clinical Interview, Repeatable Battery for the Assessment of Neuropsychological Status Update (RBANS Update) – Form A, Trial Making A & B, Clock Drawing Task, Mini Mental State Examination (MMSE), Beck Depression Inventory (BDI-II), Beck Anxiety Inventory (BAI), Mental Status/Psychiatric Symptoms Sheet, and Record Review. AR 554. The Ninth Circuit has held that clinical interviews and mental status evaluations are "objective measures and cannot be discounted as a 'self-report.'" *Buck*, 869 F.3d at 1049. Thus,

where a mental health provider relies in part on the claimant's self-reported symptoms but also relies on objective procedures and tests, it is error for the ALJ to reject the provider's opinion based on a determination that the claimant's self-reporting is unreliable. *See id.*

Accordingly, the reliance of Drs. Catlin and Thomsen on Deckard's subjective reporting does not constitute a specific or legitimate reason for rejecting their opinions.

### ii.      Contradicting Medical Opinions

The ALJ's second reason for rejecting the opinions of Drs. Catlin and Thomsen was that those opinions were "contradicted by the weight of the evidence, as discussed above" in the ALJ's decision. AR 28. The evidence "discussed above" includes opinions of an agency reviewing psychological consultant, M. Morando, M.D., who opined that Deckard is capable of simple, routine tasks with limited public contact; examining physician Aparna Dixit, Psy.D., who opined that Deckard did not have more than mild mental functioning limitations; and examining physician Michael Auza, M.D., who opined that Deckard could understand, remember, and complete simple instructions without significant impairment, and assessed moderate social limitations. AR 28.

Deckard's motion does not address the ALJ's reliance on these medical opinions, which conflict with those of Drs. Catlin and Thomsen. *See* Pl.'s MSJ at 12-13. Dr. Dixit, an examining physician on the same footing as Drs. Catlin and Thomsen, listed the following under Procedures and Tests Administered: Clinical Interview, including History, Mental Status Examination, and Review of Available Records; Wechsler Adult Intelligence Scale-IV [WAIS-IV]; Wechsler Memory Scale-IV [WMS-IV]; and Trail Making Test A and B [TMT]. AR 565. Dr. Dixit found Deckard to have only mild impairments in a number of work-related functioning activities, and no impairments in other work-related functioning activities. AR 567-70. Dr. Dixit also found Deckard to have a Full Scale IQ of 80, in contrast with the Full Scale IQ of 65 found by Drs. Catlin and Thomsen. AR 567. Dr. Dixit's opinion, standing alone, constitutes substantial evidence sufficient to support the ALJ's rejection of Drs. Catlin and Thomsen. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) ("Dr. Schatz's opinion alone constitutes substantial evidence, because it rests on his own independent examination of Tonapetyan."). The ALJ ultimately found Deckard's limitations to be more severe than opined by Dr. Dixit. AR 26-29.

11

However, "[i]t is not necessary to agree with everything an expert witness says in order to hold that his testimony contains 'substantial evidence.'" *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (internal quotation marks and citation omitted).

The ALJ's rejection of the opinions of Drs. Catlin and Thomsen also is supported by the decisions of Drs. Auza and Morando. Dr. Auza, an examining physician, found that Deckard "is able to understand, remember, and complete simple instructions without significant impairment." AR 490. Dr. Auza found it likely that Deckard would suffer moderate impairment in performing work activities on a consistent basis, and moderate difficulty with the usual stressors encountered in the work environment. *Id.* Dr. Morando, an agency nonexamining physician, found that Deckard has no significant limitations on ability remember and carry out short and simple instructions, sustain an ordinary routine, and work in proximity with others. AR 114-16. Dr. Morando found that Deckard has moderate limitations on the ability to maintain attention and concentration, understand and remember detailed instructions, and interact appropriately with others. *Id.* Neither Dr. Auza nor Dr. Morando found marked or extreme mental impairments, in contrast to Drs. Catlin and Thomsen.

The opinions of Drs. Dixit, Auza, and Morando constitute substantial evidence sufficient to support the ALJ's rejection of Drs. Catlin and Thomsen.

### iii. Work History and Daily Activities

When citing to "the weight of the evidence" in support of his rejection of the opinions of Drs. Catlin and Thomsen, the ALJ made specific reference to Deckard's work history and activities. AR 28. A conflict between a physician's opinion and a claimant's daily activities may constitute a specific and legitimate reason to discount the physician's opinion. *See Ghanim*, 763 F.3d at 1162. The ALJ noted that Deckard worked after the alleged disability onset date of August 15, 2010. AR 22, 27-28. In 2012, Deckard worked for a temporary agency for a brief period, and in 2015 he worked for a beverage catering company. AR 22. Because Deckard made only minimal earnings – $779 in 2012 and $1,991 in 2015 – this work did not constitute substantial gainful activity sufficient to disqualify Deckard from obtaining benefits. AR 22, 27-28. However, the ALJ found that "[a]lthough the later work activity did not constitute disqualifying substantial

gainful activity, it does indicate that the claimant's activities and abilities have, at least at times, been significantly greater than he has generally reported." AR 27. The ALJ also found that Deckard's daily activities were not consistent with disability. AR 27-28. Specifically, the ALJ found that Deckard's ability to ride his bicycle, use public transportation, and drive a car reflected greater physical and mental abilities than claimed, and that Deckard's ability to spend most days playing video games was inconsistent with his reported cognitive and concentration problems. AR 27. The ALJ found that Deckard's post-onset date work history, and described daily activities, were inconsistent with the severe limitations found by Drs. Catlin and Thomsen. AR 28.

Deckard argues that the activities described by the ALJ are not inconsistent with the opinions of Drs. Catlin and Thomsen. Deckard also cites to a letter from his mother, and to his own statements in his benefits application, indicating that he has no friends, isolates himself in his apartment, and spends most of his time playing video games naked and alone due to his fear and inability to be in social settings. AR 400-24. Deckard argues that the activities relied on by the ALJ are not readily transferrable to a work setting, citing *Diedrich v. Berryhill*, 874 F.3d 634 (9th Cir. 2017), for the proposition that a claimant's ability to perform some daily chores does not undermine a claim of disability.

In *Diedrich*, the ALJ found that the claimant's ability to perform certain daily activities such as "bathing, cooking, taking care of her cat, chores around the house, shopping, paying bills, and using a checkbook" did not constitute clear and convincing reasons for an adverse credibility finding, particularly since the ALJ simply ignored other evidence showing the difficulties the claimant faced in everyday life. *Diedrich*, 874 F.3d at 642-43. The evidence ignored by the ALJ in *Diedrich* "included going three to five days without sleeping; weeks-long bouts of depression; overspending and promiscuousness during manic periods; hallucinations; difficulty paying attention; inability to follow through on activities; difficulty remembering things; severe panic attacks; anxiety about, and aversion to, social situations; blackouts and alternate personalities; needing reminders to take medicine; forgetting appointments; getting sidetracked when outside the house; frustration and confusion when reading; trouble following and remembering instructions;

trouble with changes to routine; trouble handling stress; and 'extreme difficulty' staying focused on a task." *Id.* at 643. The Ninth Circuit concluded that the claimant's ability to "participate in some daily activities does not contradict the evidence of otherwise severe problems that she encountered in her daily life during the relevant period," and also that "[t]he sorts of daily activities Diedrich could perform are also not readily 'transferrable to a work environment.'" *Id.*

While *Diedrich* involved a greater quantity of evidence regarding claimant's difficulties of daily living, the Court agrees with Deckard that under the rationale of *Diedrich* the activities cited by the ALJ are not inconsistent with the opinions of Drs. Catlin and Thomsen. For example, the ALJ cites Deckard's "ability to ride his bicycle, use public transportation, and drive a car." AR 27. The ALJ ignores Deckard's testimony, discussed below in connection with the ALJ's credibility determination, that when he rode his bicycle and took public transportation he frequently got into disputes with others. AR 57-58. The ALJ cites to Deckard's "ability to spend most of his days playing video games" as being inconsistent with his reported cognitive and concentration problems. AR 27. However, the fact that Deckard plays video games all day does not provide any information regarding his ability to concentrate – he could be a terrible, distracted player. The ALJ's reference to Deckard's brief stints working after his alleged onset date ignores his extensive testimony regarding his inability to get along with co-workers and his feeling that when he is out in the world people look at him strangely and it is better to be "safe" in his house. AR 49-50.

The Court concludes that the ALJ's reference to Deckard's work history and daily activities does not constitute a specific and legitimate reason, supported by substantial evidence, to reject the opinions of Drs. Catlin and Thomsen.

### iv. Conclusion re Drs. Catlin and Thomsen

In conclusion, the Court finds that the ALJ did not err in rejecting the opinions of Drs. Catlin and Thomsen. As discussed above, the rejection is not adequately supported by those physicians' reliance on Deckard's subjective reporting or by Deckard's work history and daily activities. However, the opinions of Drs. Dixit, Auza, and Morando constitute substantial evidence to reject the opinions of Drs. Catlin and Thomsen.

### c.    Drs. Auza and Morando

Deckard contends that the ALJ improperly credited only portions of the opinions of examining psychiatrist Michael Auza, M.D., and nonexamining psychological consultant, M. Morando, M.D., without explaining why the uncredited portions of those opinions were rejected. For example, while the ALJ credited Dr. Auza's determination of a Global Assessment of Functioning (GAF) score of 50, opinion that Deckard can understand, remember, and complete simple instructions without significant impairment, and finding that Deckard would have moderate social limitations, the ALJ ignored Dr. Auza's determinations that Deckard would have moderate impairments in numerous areas such as performing work activities on a consistent basis, maintaining attendance, and managing normal workplace stressors.  AR 28, 490.  Similarly, while the ALJ credited Dr. Morando's opinion that Deckard is capable of simple, routine tasks with limited public contact, the ALJ ignored Dr. Morando's determinations that Deckard would have moderate limitations in numerous areas such as ability to remember, understand, and carry out detailed instructions, maintain attention and concentration for extended periods, and maintain regular attendance and be punctual within customary tolerances.  AR 28, AR 114-16.  Deckard argues that because the ALJ simply did not acknowledge those limitations found by Drs. Auza and Morando, the ALJ failed to articulate the requisite specific and legitimate reasons for rejecting those portions of the opinions.

The Court agrees.  It was the ALJ's responsibility to "consider all medical opinion evidence" and to resolve conflicts in that evidence.  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).  Had the ALJ expressly rejected the moderate limitations found by Drs. Auza and Morando based on other record evidence – for example, the opinion of Dr. Dixit finding no significant limitations – this Court would be required to find that rejection supported by substantial evidence.  However, the ALJ did not expressly reject or even acknowledge the limitations in question.  The ALJ stated that he "assign[ed] weight" to Dr. Auza's opinion "to the extent consistent with the residual functional capacity finding above," and listed certain portions of Dr. Auza's opinion that were expressly adopted.  AR 28.  The ALJ "assign[ed] significant weight" to Dr. Morando's opinion without limiting adoption of the opinion to the extent consistent

with the RFC, as with Dr. Auza. *Id.*

The Commissioner argues that all material limitations in the opinions of Dr. Auza and Dr. Morando are incorporated into the RFC. However, as Deckard points out, the RFC does not incorporate the limitations at issue. For example, Drs. Auza and Morando both found a moderate limitation on Deckard's ability to maintain regular attendance. AR 28, 114-16, 490. Dr. Morando found that the limitation extended to the ability to be punctual within customary tolerances. AR 28, AR 114-16. By failing to mention the moderate limitations found by Drs. Auza and Morando, and failing to incorporate them into the RFC, the ALJ implicitly rejected them. *See Gutierrez v. Berryhill*, No. 18-CV-07666-DMR, 2020 WL 999786, at *3 (N.D. Cal. Mar. 2, 2020) ("By not incorporating Dr. Montano's limitations on handling and fingering into the RFC, the ALJ implicitly rejected that portion of his opinion, even though she expressly accord[ed] great weight to the exertional and manipulative limitations' assessed by Dr. Montano without qualification."). That constituted error. "While an ALJ is not required to adopt all of an examining or treating physician's assessment, an ALJ is required to explain the reasons for rejecting those portions of an examining or treating physician's assessment that the ALJ chooses not to adopt." *Gutierrez*, 2020 WL 999786, at *3 (N.D. Cal. Mar. 2, 2020) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1038 n.10 (9th Cir. 2007)). The ALJ did not do so here.

Even when the ALJ commits legal error, the ALJ's decision will be upheld so long as the error is harmless. *See Brown-Hunter*, 806 F.3d at 492. The ALJ's error is not harmless in this case, however. At the second hearing before the ALJ, Deckard's counsel asked the VE how many absences would be permissible for an individual limited to the full range of unskilled work. AR 70. The VE responded that any more than one absence a month would precluded sustainable employment for such an individual. *Id.* Accordingly, it appears that at least with respect to the limitation on the ability to maintain regular attendance found by Drs. Auza and Morando, the disability determination may well have been different had the limitation been included in the RFC.

The Court thus finds that the ALJ erred by failing to provide specific and legitimate reasons for rejecting the moderate limitations found by Drs. Auza and Morando, while at the same time failing to incorporate those limitations into the RFC.

#### d.    Katrina Steer, LCSW

Deckard contends that the ALJ erred in rejecting the opinion of social worker Katrina Steer.  Ms. Steer completed a two-page check-the-box form opining on Deckard's mental health limitations.  AR 476-77.  Ms. Steer indicated that Deckard is markedly limited in a number of areas, including ability to work in coordination with or proximity to others without being unduly distracted by them; ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform consistent pace without an unreasonable number and length of rest periods; ability to accept instructions and respond appropriately to criticism from supervisors; and ability to get along with co-workers and peers without unduly distracting them or exhibiting behavioral extremes.  AR 476.  Ms. Steer opined that Deckard is disabled due to an adjustment disorder with mixed anxiety and depression.  AR 477.

"Only physicians and certain other qualified specialists are considered acceptable medical sources."  *Ghanim*, 763 F.3d at 1161 (internal quotation marks, citation, and alteration omitted).  As a social worker, Ms. Steer is considered an "other source."  *Turner*, 613 F.3d at 1224.  An ALJ may discount the opinion of an "other source" if he articulates a "germane" reason for doing so.  *See id.*  In this case, the ALJ assigned little weight to Ms. Steer's opinion, noting that she is not a medical source, finding that her conclusory statements are not supported by treatment notes, and stating that her assessment is contradicted by the other evidence of record.  AR 29.  These are sufficiently germane reasons for rejecting Ms. Steer's opinions as to the extent of Deckard's mental limitations.  *See Jessie C. B. v. Berryhill*, No. CV 18-25-BU-JCL, 2019 WL 1293604, at *9 (D. Mont. Mar. 21, 2019) (ALJ's rejection of social worker's opinion regarding claimant's mental limitations was based on sufficiently germane reasons where ALJ stated that the social worker's opinion was not based on objective findings, was based on the claimant's subjective symptoms, and was not consistent with other record evidence).

The Court finds that the ALJ did not err in rejecting the opinion of Ms. Steer.

#### 3.    Subjective Symptom Allegations

Deckard contends that the ALJ erred in rejecting his subjective claims regarding the extent of his symptoms arising from his intellectual disability and psychiatric disorders.  The

17

Commissioner argues that the ALJ properly evaluated Deckard's subjective symptom allegations. The Court first sets forth the applicable legal standard, then it summarizes Deckard's testimony regarding his symptoms and addresses the assertion of error.

### a. Legal Standard for Evaluating Claimant's Credibility

"An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged." *Id*. (internal quotation marks and citation omitted). "[T]he claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id*. (internal quotation marks and citation omitted).

"If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Garrison*, 759 F.3d at 1014-15 (internal quotation marks and citation omitted). "This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." *Id*. at 1015 (internal quotation marks and citation omitted).

### b. Deckard's Testimony

Deckard testified at two hearings before the ALJ. At the first hearing, held on April 27, 2016, Deckard testified briefly regarding his back pain, AR 46, and extensively regarding the impact of his claimed mental impairments, AR 39-60. He explained that he stays in his home most of the time because of fear of people and fear of what he himself might do. AR 45-46. He does not have any friends and he is not close with his family. AR 54-55. He got rid of the Internet because he does not like online socializing. AR 50. He mostly plays video games, alone. *Id*. He generally does not wear clothing in his home, and he showers approximately three times a month. AR 51. Deckard cooks for himself but he generally leaves his dirty dishes in the sink for a week or so, until the "funk" from the dishwater gets smelly. AR 52-53. Approximately once a

month, he drives himself to the grocery store. AR 45. He also does his laundry approximately once a month, at a laundry room in his complex. AR 53. He goes late at night so as to avoid other people. *Id*.

When Deckard goes outside his home, he feels worry and anger. AR 54. He knows that someone will say "something dumb" and he will end up "cussing them out" or "doing something stupid." *Id*. He described an interaction he had at Comcast when he felt that a clerk was not paying attention to him. *Id*. Deckard cussed the clerk out, picked up some coffee that he saw on a table, and threw the coffee on the clerk. *Id*. Deckard jumped over a table and tried to knock the clerk out, but the fight was broken up. *Id*. On other occasions, Deckard has thrown soda or juice at cashiers or clerks that look at him "sideways" or act stupidly. AR 57. When he used to ride the bus, before he acquired his van, he had problems dealing with people on the bus. *Id*. He would end up cussing people out and wanting to kill them. AR 58.

When Deckard worked at FedEx, he had issues with his co-workers and ultimately they did not want him there any longer. AR 44-48. Deckard worked loading carts and containers, and he felt that his co-workers harassed him by giving him too much work and telling him to go faster. *Id*. He cussed his co-workers and team leaders out sometimes. AR 48. Deckard had similar problems when he worked at Costco. AR 49. He got into arguments with his supervisors. *Id*. He stated "[a]in't another way to work maybe because of my actions," and stated that eventually he turned down a temporary job because people looked at him "weird" and he felt unsafe and wanted to "be back in the house where it's safe again." AR 50.

Deckard testified very little at the second hearing, held on February 22, 2017. He primarily described his examination by Dr. Dixit, which he claimed lasted only a few minutes and included only one test involving looking at shapes on paper. AR 66-68.

### c. ALJ's Evaluation of Deckard's Subjective Symptoms

At step one of the analytical framework for evaluating a claimant's credibility, the ALJ found that "some of the claimant's medically determinable impairments could reasonably be expected to cause the type of alleged symptoms." AR 28. The ALJ thus must articulate specific, clear and convincing reasons to discount the severity of the symptoms described by Deckard.

To meet this demanding requirement, the ALJ points out that Deckard has obtained minimal treatment for his mental conditions and has not required medications for them; cites treatment notes reflecting that Deckard at times denied depression or anxiety; observes that Deckard stopped seeking treatment for his mental conditions for more than a year and returned to counseling only at the urging of his representatives in this disability case; and opines that Deckard's daily activities are inconsistent with the disabling symptoms claimed. AR 26-27.

The Ninth Circuit has "particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299-300 (9th Cir. 1999) (internal quotation marks and citation omitted). Moreover, as Deckard states in his papers, he sought psychiatric treatment intermittently in 2014 and 2015 and then obtained ongoing treatment beginning in 2016. AR 562, 573-88. He has taken psychiatric medication on several occasions but did not find that it alleviated his symptoms. AR 68, 542-48, 576, 583. With respect to Deckard's denial of depression or anxiety, the ALJ has plucked two such denials from an extensive treatment record. One such denial was made to Dr. Auza during a psychiatric examination in which Deckard reported being increasingly socially isolated and suffering panic symptoms when he is in a crowd. AR 488. On the other occasion, Deckard denied depression and anxiety during a therapy session, but treatment notes reflected a flat affect and depressed mood, and documented Deckard's isolation and lack of interest in leaving his home. AR 535-36.

Turning to the ALJ's reliance on Deckard's daily activities, the Court has concluded above that the ALJ's characterization of those activities as indicative that Deckard has exaggerated his symptoms is not supported by the record. The ALJ's reference to Deckard's ability to use public transportation simply ignores Deckard's testimony that using public transportation generally resulted in disputes with others. AR 57-58. The ALJ's citation to Deckard's time spent playing video games provides no information regarding Deckard's cognition and concentration. AR 27. Moreover, the ALJ failed to explain how the referenced daily activities undermine Deckard's testimony that he simply cannot manage in a work environment. *See Diedrich*, 874 F.3d at 643

(finding that claimant's credibility was not undermined where "[t]he sorts of daily activities Diedrich could perform are also not readily transferrable to a work environment.'"). This case is very much like *Diedrich*, in which the Ninth Circuit concluded that "Diedrich's symptoms also included anxiety related to social interactions, making a task easy to perform inside the home potentially very difficult to perform outside the home." *Id.* Ultimately, as did the *Diedrich* court, this Court finds that Deckard's "ability to perform certain daily activities is not a clear and convincing reason to find [him] less than fully credible." *Id.*

In sum, the Court finds that the reasons proffered by the ALJ do not constitute specific, clear and convincing reasons for failing to fully credit Deckard's subjective symptoms. The ALJ's adverse credibility determination was in error.

### 4.    Step Three Determination

Deckard contends that the ALJ erred at step three by failing to find that his impairments meet or equal SSA Adult Listing 12.05(B). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2017). Deckard contends that he satisfied that listing's provision requiring a full scale IQ score of 70 or below, relying on the opinions of Drs. Catlin and Thomsen finding that he has a full scale IQ score of 65. Deckard contends that the opinions of Drs. Catlin and Thomsen also demonstrate that he meets the other requirements of the listing. As discussed above, however, Deckard has failed to show that the ALJ erred in rejecting the opinions of Drs. Catlin and Thomson. Dr. Dixit, whose opinion was credited, found that Deckard has a full scale IQ score of 80.

Accordingly, the Court finds that the ALJ did not err at step three by failing to find that Deckard's impairments meet or equal SSA Adult Listing 12.05(B).

### 5.    RFC and Step Five Determination

Deckard asserts that the ALJ erred in failing to include all of his limitations in the RFC. He also contends that the ALJ erred in relying on the Grids to determine disability at step five, because the Grids apply only when they completely and accurately describe the claimant's abilities and limitations. *See Moore*, 216 F.3d at 869. Deckard contends that the Grids are inapplicable in the present case, because they do not reflect intellectual disability.

Deckard's position on these points is well-taken in light of the Court's conclusions that the

ALJ erred in excluding certain limitations from the RFC without explanation, and erred in failing to fully credit Deckard's subjective symptoms. Given those conclusions, the Court necessarily must find that the ALJ's step five disability determination, based on application of the Grids to the flawed RFC, is not supported by substantial evidence in the record.

### C. Remand for Further Proceedings is Appropriate

Having concluded that the ALJ committed the errors discussed above, the Court must decide whether the errors are harmless and, if not, the appropriate remedy. "An error is harmless only if it is inconsequential to the ultimate nondisability determination, or if despite the legal error, the agency's path may reasonably be discerned." *Brown-Hunter*, 806 F.3d at 494 (internal quotation marks and citations omitted). Here, the errors were not harmless, because they were key to the RFC finding upon which the ALJ based his denial of benefits at step five. Moreover, the Court cannot discern the agency's path absent appropriate consideration of all relevant evidence of record. The Court therefore must determine the appropriate remedy.

In his motion, Deckard requests "remand for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g)." Pl.'s MSJ at 24, ECF 19. However, in his reply brief, Deckard requests "[r]emand for award of benefits." Pl.'s Reply at 8, ECF 23.

A remand for an immediate award of benefits may be appropriate in the "rare circumstances" in which the following three requirements are met: (1) "the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion"; (2) "the record has been fully developed and further administrative proceedings would serve no useful purpose"; and (3) "if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Brown-Hunter*, 806 F.3d at 495 (internal quotation marks and citation omitted). Even if all three requirements are satisfied, the Court "retain[s] flexibility in determining the appropriate remedy." *Id.* (internal quotation marks and citation omitted).

The Court concludes that a remand for further proceedings, as initially requested by Deckard in his motion, is most appropriate here. The first factor clearly is met, as the ALJ did not provide legally sufficient reasons for failing to credit certain aspects of the opinions of Drs. Auza

22

and Morando and failing to credit Deckard's testimony.  The second factor is not met, however, because further proceedings are necessary so that all of the medical evidence that is entitled to credit, and Deckard's testimony, may be considered in formulating an appropriate RFC.  It is unclear whether the third factor is met, because it is unclear on this record what an appropriate RFC would look like and whether there are jobs in the economy for an individual with such an RFC.

Accordingly, the Court GRANTS IN PART AND DENIES IN PART Deckard's motion for summary judgment and DENIES the Commissioner's cross-motion for summary judgment. Pursuant to sentence four of 42 U.S.C. § 405(g), the Court REVERSES the denial of benefits and REMAND for further administrative proceedings consistent with this order.

## IV. ORDER

(1) Plaintiff's motion for summary judgment is GRANTED IN PART AND DENIED IN PART;

(2) Defendant's motion for summary judgment is DENIED;

(3) The denial of benefits is REVERSED; and

(4) The matter is REMANDED to the Commissioner for further proceedings consistent with this order.

Dated:  March 10, 2020

BETH LABSON FREEMAN
United States District Judge